PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 09-2644

———

BRIAN D. KELLY,

Appellant

v.

BOROUGH OF CARLISLE;
DAVID J. ROGERS, individually and as a police
officer for the Carlisle Borough Police Department

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 07-cv-01573)
District Judge: Honorable Yvette Kane

———

Argued February 1, 2010
Before: Chief Judge McKEE, HARDIMAN, *Circuit Judges*
and POLLAK[*], *District Judge*.

———

[*] The Honorable Louis H. Pollak, Senior District Judge
for the United States District Court for the Eastern District of

(Filed: October 4, 2010)

Dennis E. Boyle [Argued]
Randall L. Wenger
Boyle, Neblett & Wenger
4660 Trindle Road
Suite 200
Camp Hill, PA 17011-0000
        *Attorneys for Appellant*

David J. MacMain [Argued]
Timothy J. Kepner
Scot R. Withers
Lamb McErlane
24 East Market Street
P.O. Box 565
West Chester, PA 19381-0000
        *Attorneys for Appellees*

Nancy Winkelman [Argued]
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103
        *Attorney for Amicus Appellant*

---

Pennsylvania, sitting by designation.

2

OPINION OF THE COURT
―――――

HARDIMAN, *Circuit Judge*.

Brian Kelly appeals the District Court's summary judgment in favor of police officer David Rogers and the Borough of Carlisle. Kelly filed a civil rights action, claiming that his First and Fourth Amendment rights were violated when he was arrested for filming Officer Rogers during a traffic stop. The gravamen of Kelly's appeal—that the District Court erred when it held that Officer Rogers's reliance upon legal advice before he arrested Kelly shielded him from liability—raises a question of first impression in the Third Circuit.

I.

A.

On May 24, 2007, Kelly was riding around Carlisle, Pennsylvania in a truck driven by his friend, Tyler Shopp. As was his habit, Kelly brought along a small, hand-held video camera, which he used to record people for no particular reason. In the course of their meanderings, Shopp was pulled over by Officer Rogers for speeding and for violating a bumper height restriction. During the traffic stop, Kelly placed the video camera in his lap and started recording Officer Rogers, allegedly without Rogers's knowledge or consent. Kelly testified that he began recording Rogers "after I saw how he was acting," which conduct allegedly included Rogers yelling at Shopp. Shopp and

3

Rogers stated otherwise, testifying that Rogers acted professionally at all times. There is no dispute that Kelly was holding the camera in his lap during the encounter, although the parties disagree as to whether the camera was hidden. Rogers contends the camera was hidden by Kelly's hands, while Kelly claims it was in plain sight the entire time he was recording.

Toward the end of the traffic stop, Officer Rogers informed Shopp and Kelly that he was recording the encounter.[1] Rogers claims he then noticed Kelly was recording him, which Rogers believed was a violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act (Wiretap Act), 18 PA. CONS. STAT. §§ 5701-82. Rogers ordered Kelly to turn over the camera and Kelly complied. Rogers then returned to his police car and called Assistant District Attorney John Birbeck to confirm that Kelly had violated the Wiretap Act.[2] At his deposition, Rogers explained that he thought Kelly was violating the Wiretap Act because police must inform people when they record traffic stops. In Rogers's words: "as a police officer, when we conduct traffic stops and we're audio and

[1] It was routine policy for the Carlisle Police to record all traffic stops using a video camera mounted to the police car and a microphone attached to the officer's shirt. According to Rogers, he believed he was recording the traffic stop, but later learned the equipment had malfunctioned.

[2] Rogers's call to ADA Birbeck was consistent with Borough policy, which was to follow the ADA's advice "unless it was something outlandish or outrageous."

4

video recording, we know – I know it's the law that I must at some point during the stop inform the occupants that they're being audio and video recorded in accordance with the [A]ct." Because Kelly had not informed Rogers that he was recording, Rogers believed Kelly violated the Wiretap Act.

ADA Birbeck also concluded that Kelly violated the Wiretap Act based on the facts as described by Rogers. Rogers stated that he had stopped a car for speeding and bumper height violations. When he realized the passenger was videotaping him, he had seized the camera. Rogers did not tell Birbeck that he himself was also videotaping the stop.[3] Rogers then asked Birbeck whether Kelly's actions constituted a violation of the Wiretap Act. After reviewing the statute, Birbeck told Rogers that it was appropriate to make an arrest, although he advised Rogers not to seek bail at Kelly's arraignment.

After hearing Birbeck's opinion, Rogers called for a back-up unit and at least three additional officers arrived to assist with Kelly's arrest. Kelly testified that while he was being transported from the scene an officer admonished him: "when are you guys going to learn you can't record us." Kelly was arraigned before a local magistrate, who ordered bail despite Rogers's recommendation that Kelly be released on his own

---

[3] The District Court stated that it was disputed whether Rogers informed Birbeck that he was also recording. But Birbeck testified in his deposition that he was not so informed, and Rogers did not say otherwise, so Birbeck's testimony controls.

5

recognizance. Kelly could not make bail, however, so he was held in the Cumberland County Prison for 27 hours. Several weeks later, the Cumberland County District Attorney dropped the charges against Kelly, but issued a memorandum opining that Rogers had probable cause to arrest Kelly.

B.

After the charges against him were dropped, Kelly sued Officer Rogers and the Borough of Carlisle under 42 U.S.C. § 1983, alleging violations of the First and Fourth Amendments to the United States Constitution as well as various state law claims. Following discovery, Defendants filed a motion for summary judgment, and Kelly sought partial summary judgment. The District Court granted summary judgment to Officer Rogers based on qualified immunity, and granted the Borough summary judgment because Kelly failed to present facts sufficient to establish municipal liability.

In the District Court's view:

Defendant [Rogers] acted as reasonably as could be expected. He observed Kelly videotaping the police stop without his permission. Then, he followed police policy in calling the ADA to confirm that there was probable cause to make an arrest under the Wiretap Act. . . . [T]he ADA's advice was reasonable, so Defendant proceeded with the arrest. The Court agrees that any reasonable officer in Defendant's situation would

6

> have likewise relied on the advice given by the
> ADA.

*Kelly v. Borough of Carlisle*, 2009 WL 1230309, at \*4 (M.D. Pa. May 4, 2009). In its analysis of the Fourth Amendment issue, the District Court stated that because Rogers did not have a reasonable expectation of privacy in his speech, ADA Birbeck may have incorrectly concluded there was probable cause to arrest Kelly. *Id*. Nonetheless, the Court held Rogers was entitled to qualified immunity on Kelly's Fourth Amendment claim because of Rogers's "good-faith reliance on this outside legal assessment of the situation." *Id*.

As for Kelly's First Amendment claim, the District Court held that it would not have been clear to a reasonable officer that arresting Kelly for violating the Wiretap Act would infringe upon his free speech rights. The Court reasoned that (1) it was unclear whether Kelly had a right to videotape the police stop because this Court had stated only that there "may" be a right to videotape police performing their duties on public property, and (2) even if the right to videotape had been clearly established, a reasonable officer would have thought his actions were constitutional since Rogers reasonably believed there was probable cause to arrest. *Id*. at \*8. Kelly timely appealed the District Court's judgment.[4]

II.

---

[4] The District Court had jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291.

7

Our review of the District Court's summary judgment is plenary, and we apply the same standards that the District Court applied in determining whether summary judgment was appropriate. *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009). Viewing the evidence in the light most favorable to the nonmovant, summary judgment is appropriate only if there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)). "The mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, we ask: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. This inquiry "must be undertaken in light of the specific context of the case." *Id*. at 201. Therefore, to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged

8

violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000); *Paff v. Kaltenbach*, 204 F.3d 425, 431 (3d Cir. 2000).

In *Saucier*, the Supreme Court required lower courts to determine whether a constitutional right was violated before deciding whether the law was clearly established. 533 U.S. at 201. This "rigid 'order of battle,'" *Brosseau v. Haugen*, 543 U.S. 194, 201-02 (2004) (Breyer, J., concurring), was short-lived, however, as the Supreme Court overruled *Saucier*'s order of operations in *Pearson v. Callahan*, 129 S.Ct. 808, 817 (2009), holding that trial judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand," *id*. at 818.

Recognizing its discretion to do so under *Pearson*, the District Court bypassed the question of whether Kelly's constitutional rights were violated and first considered whether the law was clearly established. Although the District Court explicitly held that the First Amendment law was not clearly established, its analysis of the Fourth Amendment did not engage the relevant state court precedents interpreting the Wiretap Act. Instead, the District Court simply concluded that Officer Rogers acted reasonably under the circumstances.

III.

9

A.

Kelly claims Officer Rogers violated his clearly established Fourth Amendment rights by arresting him without probable cause. In challenging the District Court's conclusion that Officer Rogers acted reasonably, Kelly contends the District Court failed to analyze the Wiretap Act and inappropriately relied on the presence of legal advice. Conversely, Officer Rogers argues that reliance on a prosecutor's advice is a permissible consideration in determining the reasonableness of his actions, and that the District Court correctly held his reliance was reasonable.

The Supreme Court has recognized that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson*, 483 U.S. at 641. "The qualified immunity standard 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Gilles v. Davis*, 427 F.3d 197, 203 (3d Cir. 2005) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818-19.

Neither the Supreme Court nor this Court has squarely addressed the question of whether a police officer's reliance upon legal advice cloaks him with qualified immunity.

10

Although there is no holding directly on point, we do not write on a blank slate. In *Malley v. Briggs*, the Supreme Court considered a police officer's entitlement to qualified immunity when he applied for an arrest warrant that was approved by a magistrate but later found to lack probable cause. 475 U.S. 335 (1986). The Court held the magistrate's issuance of the warrant did not automatically shield the officer: "[d]efendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id*. at 341. The Court acknowledged that such a standard might cause officers to hesitate before submitting a request for a warrant, but concluded that:

> [S]uch reflection is desirable, because it reduces the likelihood that the officer's request for a warrant will be premature. Premature requests for warrants are at best a waste of judicial resources; at worst, they lead to premature arrests, which may injure the innocent or, by giving the basis for a suppression motion, benefit the guilty.

*Id.* at 343-44.

Accordingly, a police officer is not entitled to qualified immunity if "a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Id.* at 345; *see also Orsatti v. N.J. State Police*, 71 F.3d 480, 484-85 (3d Cir. 1995) (applying *Malley*). In rejecting

11

the notion that the officer's act of applying for a warrant is *per se* objectively reasonable, the Supreme Court held police accountable for "creat[ing] the unnecessary danger of an unlawful arrest." *Malley*, 475 U.S. at 345. Because participants in the justice system are fallible, there is a risk that magistrates will make mistakes. *Id*. at 345-46. In light of this risk, it is "reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment." *Id.* at 346.

Like the Supreme Court in *Malley*, we reject the notion that a police officer's decision to contact a prosecutor for legal advice is *per se* objectively reasonable. Nevertheless, we recognize the virtue in encouraging police, when in doubt, to seek the advice of counsel. Considering the proliferation of laws and their relative complexity in the context of a rapidly changing world, we cannot fairly require police officers in the field to be as conversant in the law as lawyers and judges who have the benefit not only of formal legal training, but also the advantage of deliberate study.

Consistent with these principles, the First Circuit has stated that advice obtained from a prosecutor prior to making an arrest "should be factored into the totality of the circumstances and considered in determining the officer's entitlement to qualified immunity." *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004) (collecting cases from other circuits); *see also Stearns v. Clarkson*, --- F.3d ---, 2010 WL 3191511, at *5 (10th Cir. Aug. 13, 2010) (citing *Cox* and holding that receipt of favorable legal advice prior to making arrest does not necessarily entitle officer to qualified immunity because it is only one relevant factor). In

12

*Cox*, Trooper Hainey investigated a tip that Cox's son was dealing drugs. After searching Cox's home and collecting evidence, Trooper Hainey consulted with an assistant district attorney, who agreed there was sufficient evidence to arrest Cox on drug charges, and proceeded to make the arrest. *Id*. at 27-28. Reviewing the evidence in support of the arrest, the First Circuit concluded that "Hainey's judgment call may walk a thin line between probable cause and mere suspicion," however, it was not "plainly incompetent." *Id*. at 32. The *Cox* court found that the reasonableness of Hainey's actions was "cinch[ed]" by Hainey's consultation with the local prosecutor. *Id*. Receipt of legal advice after "mak[ing] a full presentation of the known facts to a competent prosecutor" would provide the officer with a "stronger reason to believe that probable cause existed." *Id.* at 35. In adopting a "totality of the circumstances" approach, the First Circuit cited the "good sense" of a policy that "encourage[s] officers to obtain an informed opinion before charging ahead and making an arrest in uncertain circumstances." *Id*.

Although we agree with much of the First Circuit's opinion in *Cox*, we do not adopt its "totality of the circumstances" approach. In our view, encouraging police to seek legal advice serves such a salutary purpose as to constitute a "thumb on the scale" in favor of qualified immunity. Accordingly, we hold that a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause. That reliance must itself be objectively reasonable, however, because "a wave of the prosecutor's wand cannot

13

magically transform an unreasonable probable cause determination into a reasonable one." *Id*. at 34. Accordingly, a plaintiff may rebut this presumption by showing that, under all the factual and legal circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice.

B.

In granting summary judgment, the District Court reviewed the facts of the case and concluded that Officer Rogers acted reasonably under the circumstances. Specifically, the District Court noted that Rogers "observed Kelly videotaping the police stop without his permission. . . . [H]e followed police policy in calling the ADA . . . and the ADA's advice was reasonable." *Kelly*, 2009 WL 1230309, at *4. The District Court also was influenced by Rogers's "good-faith reliance on this outside legal assessment of the situation." *Id*. On the other hand, the Court did not analyze sufficiently the state of Pennsylvania law regarding the Wiretap Act at the time of Kelly's arrest. As we shall explain, this omission was problematic.

Before turning to the District Court's legal analysis, we turn to factual issues that remain in dispute. First, the Court found that Kelly recorded Officer Rogers "without his permission." *Kelly*, 2009 WL 1230309, at *4. Both Kelly and his friend Shopp testified that the camera sat conspicuously on Kelly's lap, and argued that Officer Rogers's initial failure to order Kelly to cease recording constituted Rogers's implied consent thereto. Thus, while noting that "it is disputed whether

14

the camera was in plain view or was covered by Plaintiff's hands," the District Court apparently rejected Kelly's assertion that Officer Rogers was aware of the recording when he initially approached the car.  *Id*. at 2.  On remand, the District Court should make clear findings of fact regarding this issue.

Second, Kelly claimed that Rogers did not call ADA Birbeck to seek legal advice, but merely to obtain an approval number for an arrest, which Kelly contends was required by Cumberland County Rule of Procedure 107.1.  As ADA Birbeck testified: "Officer Rogers asked for approval [for an arrest] and I gave him an approval number to charge."  The District Court must make factual findings on this issue as well.

In addition to its failure to make essential factual findings, the District Court did not analyze sufficiently the state of the law at the time of Kelly's arrest.  *See Orsatti v. N.J. State Police*, 71 F.3d 480, 484-85 (3d Cir. 1995).  Instead, the District Court relied upon the mere existence of legal advice without considering the relative clarity or obscurity of the Pennsylvania Wiretap Act and the cases interpreting it.  This was error.

At the time of Kelly's arrest, it was clearly established that an arrest could be made only on the basis of probable cause. *Berg*, 219 F.3d at 272.  "Whether it would have been clear to a reasonable officer that probable cause justified [an] arrest requires an examination of the crime at issue," *Gilles*, 427 F.3d at 204, in this case, a violation of the Pennsylvania Wiretap Act. Under the Wiretap Act, "a person is guilty of a felony of the third degree if he: (1) intentionally intercepts . . . any . . . oral communication . . . ."  18 PA. CONS. STAT. § 5703.  The statute

15

defines "oral communication" as "[a]ny oral communication uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 PA. CONS. STAT. § 5702.

In 1998, the Pennsylvania Supreme Court explained the elements of a Wiretap Act violation as follows:

> [I]n order to establish a prima facie case under the Wiretap Act for interception of an oral communication, a claimant must demonstrate: (1) that he engaged in a communication; (2) that he possessed an expectation that the communication would not be intercepted; (3) that his expectation was justifiable under the circumstances; and (4) that the defendant attempted to, or successfully intercepted the communication, or encouraged another to do so.

*Agnew v. Dupler*, 717 A.2d 519, 522 (Pa. 1998). In *Agnew*, two police officers claimed their police chief violated the Wiretap Act when he used an intercom to eavesdrop on squadroom conversations. *Id.* at 521. The court held the chief did not violate the Wiretap Act because the officers did not have a reasonable expectation of privacy in statements made in the squadroom and "one cannot have an expectation of non-interception absent a finding of a reasonable expectation of privacy." *Id.* at 523. This holding squelched the distinction

16

developing in some lower court cases between a reasonable expectation of non-interception and an expectation of privacy. *See id*. at 524-25 (Nigro, J. concurring) ("Contrary to the Majority's position, I believe that the expectation of non-interception and the expectation of privacy involve two distinct inquiries."). In support of its finding of no reasonable expectation of privacy, the court noted that anyone in the squadroom could overhear the conversation, and the door to the squadroom was open at the time, such that people outside the room could also hear the conversation. *Id*. at 524.

Since *Agnew,* numerous state and federal courts have applied the expectation of privacy requirement in cases alleging a violation of the Pennsylvania Wiretap Act.[5] Even more

---

[5] *See e.g.*, *Kline v. Sec. Guards, Inc.*, 386 F.3d 246 (3d Cir. 2004) (claims brought under Pennsylvania Wiretap Act were not preempted by the Labor Management Relations Act because it was not necessary to look to the collective bargaining agreement to determine whether the employees had a reasonable expectation of privacy in their communications); *Walsh v. Krantz*, 2008 WL 2329130, at *6 (M.D. Pa. June 4, 2008) (alleged eavesdropping on telephone conversation adequately stated claims under Wiretap Act); *Care v. Reading Hosp. & Med. Ctr.*, 2004 WL 728532, at *8-9 (E.D. Pa. Mar. 31, 2004) (plaintiffs adequately asserted a reasonable expectation of privacy in conversations with labor consultant to state claim under Pennsylvania Wiretap Act); *Schwartz v. Dana Corp./Parish Div.*, 196 F.R.D. 275, 282-83 (E.D. Pa. 2000) (Wiretap Act claims not suitable for class certification because

17

significantly, almost ten years before *Agnew*, the Pennsylvania Supreme Court held that secretly recording a police officer in the performance of his duties did not violate the Wiretap Act. *See Commonwealth v. Henlen*, 564 A.2d 905, 906 (Pa. 1989). In *Henlen*, a theft suspect who covertly recorded a state trooper's interrogation did not violate the Wiretap Act because the trooper did not have a reasonable expectation of privacy in the statements. *Id*. at 906. The factors belying a reasonable expectation of privacy included: (1) "oral interrogations of suspects by the police are generally recorded, albeit by the police rather than the suspect"; (2) the trooper was taking notes during the interview; and (3) the trooper allowed a third party to sit in on the interview. *Id.*

In light of the foregoing precedents, at the time of Kelly's arrest, it was clearly established that a reasonable expectation of privacy was a prerequisite for a Wiretap Act violation. Even more to the point, two Pennsylvania Supreme Court cases—one almost 20 years old at the time of Kelly's arrest—had held that

_____

of individualized inquiry into whether employee had an expectation of privacy)*; Keppley v. Sch. Dist.*, 866 A.2d 1165, 1172 (Pa. Commw. Ct. 2005) (trial court required to examine whether students had a reasonable expectation of privacy in communications on school bus); *Commonwealth v. Ward*, 3 Pa. D.&C. 5th 268, 273 (Pa. Com. Pl. Ct. 2007) ("In *Commonwealth v. Christopher* and *Agnew* the Appellate Courts have made it clear that a communication is not an 'oral communication' as defined by the Wiretap[] Act unless the victim has a reasonable expectation of privacy." (citations omitted)).

covertly recording police officers was not a violation of the Act. Finally, it was also clearly established that police officers do not have a reasonable expectation of privacy when recording conversations with suspects.

Instead of attempting to negate the clearly established nature of the expectation of privacy requirement or to distinguish the Pennsylvania Supreme Court's decisions in *Henlen* or *Agnew*, counsel for Rogers and the Borough of Carlisle failed even to mention these critical precedents among the 56 cases cited in their otherwise comprehensive brief. Instead, Rogers merely notes that the Wiretap Act "does not contain the phrase 'reasonable expectation of privacy' anywhere within the relevant portions of the Act . . . ." This argument, while technically correct, is insufficient to establish the objective reasonableness of Rogers's actions. *See, e.g., Johnson v. Hawe*, 388 F.3d 676, 687 (9th Cir. 2004) (denying qualified immunity for arrest without probable cause based on its finding that the Washington Privacy Act was sufficiently established under state case law and an opinion from state Attorney General stating that police chief should have known that there was no reasonable expectation of privacy in communications over police radio), *cert. denied*, 544 U.S. 1048 (2005); *United States v. Lopez-Valdez*, 178 F.3d 282, 289 (5th Cir. 1999) (officer's good-faith but erroneous belief that broken tail light was a violation of Texas law was not objectively reasonable because, in light of ten-year-old state court decision holding such condition did not violate the law, "no well trained Texas police officer could reasonably believe that white light appearing with red light through a cracked taillight lens constituted a violation of traffic law").

19

Police officers generally have a duty to know the basic elements of the laws they enforce. *See Hall v. Ochs*, 817 F.2d 920, 924 (1st Cir. 1987); *see, e.g.*, *Lawrence v. Reed*, 406 F.3d 1224, 1234 (10th Cir. 2005) (reliance on city attorney's advice did not entitle officer to qualified immunity under extraordinary circumstances test because officer should have known, independently, that constitution requires notice and a hearing before depriving a citizen of property and there were no exigent circumstances requiring that the attorney's advice "be acted on immediately"); *Peterson v. City of Plymouth*, 945 F.2d 1416, 1420-21 (8th Cir. 1991) (no qualified immunity for officer who sought arrest warrant for theft where there was no evidence of intent to commit theft and officer "knew or should have known" that it was therefore not a criminal matter). The question remains, in this case, how the Pennsylvania Wiretap Act fits into the landscape painted by these precedents. We leave that determination, in the first instance, to the District Court.

In sum, because the District Court did not consider the facts in the light most favorable to Kelly, did not evaluate the objective reasonableness of Officer Rogers's decision to rely on ADA Birbeck's advice in light of those facts, and did not evaluate sufficiently the state of Pennsylvania law at the relevant time, we will vacate the summary judgment insofar as it granted qualified immunity to Officer Rogers on Kelly's Fourth Amendment claims and remand for additional factfinding and application of the proper legal standard.

IV.

A.

20

Kelly also claims the District Court erred when it held his First Amendment right to videotape matters of public concern was not clearly established.[6]  Kelly contends his First

---

[6] Before turning to Kelly's First Amendment claims, we will address the amicus brief submitted by the American Civil Liberties Union.  The ACLU takes issue with the District Court's decision to skip the "violation prong" of the qualified immunity inquiry and proceed directly to the "clearly established" prong.  The ACLU urges us to establish a rule that the *Saucier* sequence should be the default approach to qualified immunity analysis, especially in cases alleging violations of the First Amendment.  The ACLU suggests that deviation from the *Saucier* sequence is proper only in cases involving  unusual facts or uncertain state law.

We decline to adopt the rule proffered by the ACLU because it is inconsistent with *Pearson*.  Although the Supreme Court acknowledged that *Saucier's* two-step procedure is often advantageous, *Pearson*, 129 S.Ct. at 821, it also recognized that the costs of *Saucier* outweigh its benefits in some cases.  As the Supreme Court explained:

> [T]he rigid *Saucier* procedure comes with a price. The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case.  There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact

21

Amendment rights were violated when Rogers seized his video camera (prior to calling ADA Birbeck) and when Rogers arrested him. In defense, Rogers argues that a "right to surreptitiously videotape a police officer without an expressive or communicative purpose" was not clearly established at the time of the arrest.[7]

---

there is such a right.

*Id*. at 818. For this reason, the Court held that district courts have wide discretion to decide which of the two prongs established in *Saucier* to address first. In our view, it would be unfaithful to *Pearson* if we were to require district courts to engage in "an essentially academic exercise" by first analyzing the purported constitutional violation in a certain category of cases. *Id.* Should the Supreme Court decide that *Saucier* sequencing is necessary in First Amendment cases or any other type of case, it may establish such a rule. It is not our place to do so in light of *Pearson*, and, consequently, the District Court did not abuse its discretion when it bypassed the constitutional question and proceeded to the clearly established prong.

[7] We note that Kelly asserts that the camera was not hidden, but was in plain view; therefore, we cannot accept Defendants' characterization of the recording as "surreptitious" at the summary judgment stage. Second, it is unclear why the "surreptitious" nature of the videotaping would be significant to whether the videotaping implicates the existence of a First Amendment right or its clearly established nature. The Defendants have not cited any cases making such a distinction,

22

In determining whether a right is clearly established, it is not necessary that the exact set of factual circumstances has been considered previously. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (being "clearly established" does not require that "the very action in question has previously been held unlawful"). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances," *id.* at 741, as long as the law gave the defendant officer "fair warning" that his conduct was unconstitutional. *See Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004) (holding that even though neither the Supreme Court nor the Third Circuit had addressed the issue, the right to be free from excessive force in the course of handcuffing was clearly established based on the case law of other circuits).

We have not addressed directly the right to videotape police officers. In *Gilles v. Davis*, we hypothesized that "videotaping or photographing the police in the performance of their duties on public property *may* be a protected activity." 427 F.3d at 212 n.14 (citing *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000)) (emphasis added). We also noted that "[m]ore generally, photography or videography that has a communicative or expressive purpose enjoys some First Amendment protection." *Id.* (citations omitted). Though we have not had occasion to decide this issue, several other courts have addressed the right to record police while they perform

_____

and we fail to see how the covert nature of a recording would affect its First Amendment value, which will most often be realized upon the recording's dissemination.

23

their duties. We turn now to these cases, as well as cases regarding the more general right to record matters of public concern.

1.

In *Smith v. City of Cumming*, the Eleventh Circuit recognized a "First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct." 212 F.3d 1332, 1333 (11th Cir. 2000), *cert. denied*, 531 U.S. 978 (2000). The court declared: "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Id.* Other than noting that "Mr. Smith had been prevented from videotaping police actions," *id.* at 1332, the Eleventh Circuit provided few details regarding the facts of the case, making it difficult to determine the context of the First Amendment right it recognized. Ultimately, the court affirmed summary judgment for the defendants, finding that Mr. Smith had not shown that the defendants violated his right to videotape the police. *Id.* In the decade since *City of Cumming* was decided, our decision in *Gilles* is the only federal appeals court case to cite it. 427 F.3d at 212, n.14.

District courts within the Third Circuit have also addressed the right to record police officers. In *Robinson v. Fetterman*, the United States District Court for the Eastern District of Pennsylvania, relying on *City of Cumming*, held there is a free speech right to film police officers in the performance of their public duties. 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005).

24

In that case, Robinson was concerned about the way police were conducting truck inspections on a local road, so he decided to document their behavior by filming them from an adjacent property. *Id.* at 539. Robinson videotaped from a position approximately 20 to 30 feet from the highway and never interfered with police activities. *Id.* The police approached Robinson and told him to leave; when he refused, they arrested him for violating Pennsylvania's harassment statute. Robinson was found guilty of harassment, but the conviction was overturned on appeal and Robinson filed a § 1983 action against the troopers. *Id.* at 540.

After noting that Robinson had First Amendment rights to receive information and ideas, and to express his concern about the safety of the truck inspections, the district court held: "there can be no doubt that the free speech clause of the Constitution protected Robinson as he videotaped the defendants." *Id.* at 541. The court reasoned that a First Amendment right existed regardless of whether Robinson had "any particular reason for videotaping the troopers," though in this case he wanted to gather evidence of his safety concerns. *Id.* Finally, the court held that no reasonable trooper could have believed that the videotaping constituted harassment, and rejected the troopers' argument that they reasonably relied on the statements of a district justice who, two years earlier, had convicted Robinson for similar behavior. *Id.* at 542 (police cannot "ignore or unreasonably apply a valid law in order to arrest someone who annoys or offends them").

In *Pomykacz v. Borough of West Wildwood*, the United States District Court for the District of New Jersey held that

25

photographing a police officer in connection with a citizen's political activism was protected by the First Amendment. 438 F. Supp. 2d 504, 513 (D.N.J. 2006). In that case, Pomykacz—a self-described "citizen-activist"—became concerned that a romantic relationship between the mayor and a police officer created risks of nepotism and conflict of interest. Pomykacz began monitoring the officer and mayor, including photographing the officer while she was on duty. The officer and mayor initiated criminal charges against Pomykacz for harassment. In her subsequent § 1983 action alleging First Amendment retaliation, the district court held that Pomykacz offered sufficient evidence that her photography was linked to her speech about local government to be protected by the First Amendment. *Id*. at 512-13. Nevertheless, the court declined to adopt Pomykacz's blanket assertion that "the observation and monitoring of public officials is protected by the [F]irst [A]mendment." *Id.* at 513 n.14 (alteration in original). Instead, the court noted that "[a]n argument can be made that the act of photographing, in the abstract, is not sufficiently expressive or communicative and therefore not within the scope of First Amendment protection - even when the subject of the photography is a public servant." *Id.*

2.

In an effort to show that Rogers should have been on notice of a right to record police officers, Kelly also cites a number of cases for the proposition that a general right to record matters of public concern has been clearly established. Many of these cases recognize such a right only in passing. *See, e.g., Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995)

26

(mentioning that plaintiff who tried to film demonstration on public street had a "First Amendment right to film matters of public interest" but ultimately granting qualified immunity to police because it was not clearly established under what circumstances conversations in public could be protected under state privacy statute); *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (prohibition on tape recording meeting of state committee "touched on expressive conduct protected by the Free Speech Clause of the First Amendment"); *Demarest v. Athol/Orange Cmty. Television, Inc.*, 188 F. Supp. 2d 82, 94 (D. Mass. 2002) (producers of news show on state-owned cable channel have a First Amendment right to film matters concerning potential conflicts of interests of local officials); *Thompson v. City of Clio*, 765 F. Supp. 1066, 1070 (M.D. Ala. 1991) (First Amendment right to record public town council meetings); *Lambert v. Polk County*, 723 F. Supp. 128, 133-35 (S.D. Iowa 1989) (holding that individuals enjoy the same First Amendment rights to "make and display videotapes of events" as news organizations where individual filming downtown area was hoping to capture images of interest so he could sell them to a television station). We find these cases insufficiently analogous to the facts of this case to have put Officer Rogers on notice of a clearly established right to videotape police officers during a traffic stop.

Moreover, even insofar as it *is* clearly established, the right to record matters of public concern is not absolute; it is subject to reasonable time, place, and manner restrictions, as long as they are "justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative

27

channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted). For example, we have held that the right to record public meetings does not necessarily create a right to videotape those meetings. In *Whiteland Woods, L.P. v. Township of West Whiteland*, we held that a planning committee's adoption of a resolution prohibiting videotaping of public meetings did not violate the First Amendment. 193 F.3d 177, 183 (3d Cir. 1999). We analyzed that case as one involving the First Amendment right to access information, and declined to apply the speech forum doctrine because it "[t]raditionally . . . applies to 'expressive' or 'speech' activity," and the alleged constitutional violation "consisted of a . . . right to receive and record information," not "speech or other expressive activity." *Id*. Although we recognized that the right to receive information and ideas was well established, *id*. at 180, we held that the planning committee's prohibition on videotaping was not unconstitutional because other means of recording the meeting—for example, note-taking—were permitted, thus protecting the public's right of access. *Id.* at 183. We concluded that "Whiteland Woods' right of access to Planning Commission meetings did not create a federal constitutional right to videotape the meetings." *Id.* at 184; *see also S.H.A.R.K. v. Metro Parks Serving Summit County*, 499 F.3d 553, 559-63 (6th Cir. 2007) (analyzing animal rights group's claim that its First Amendment right to videotape government-ordered deer culling in state park after hours as a right to access claim instead of free expression claim, and finding no violation of that right).

3.

28

In light of the foregoing, we conclude there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on "fair notice" that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment. Although *Smith* and *Robinson* announce a broad right to videotape police, other cases suggest a narrower right. *Gilles* and *Pomykacz* imply that videotaping without an expressive purpose may not be protected, and in *Whiteland Woods* we denied a right to videotape a public meeting. Thus, the cases addressing the right of access to information and the right of free expression do not provide a clear rule regarding First Amendment rights to obtain information by videotaping under the circumstances presented here.

Our decision on the First Amendment question is further supported by the fact that none of the precedents upon which Kelly relies involved traffic stops, which the Supreme Court has recognized as inherently dangerous situations. *See, e.g.*, *Arizona v. Johnson*, 129 S.Ct. 781, 786 (2009) ("[T]raffic stops are especially fraught with danger to police officers. The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized . . . if the officers routinely exercise unquestioned command of the situation.") (alterations in original) (internal quotations and citations omitted); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (recognizing "the inordinate risk confronting an officer as he approaches a person seated in an automobile"). For these reasons, we hold that the right to videotape police officers during traffic stops was not clearly established and Officer Rogers was entitled to qualified immunity on Kelly's First Amendment claim.

29

V.

We last turn to Kelly's appeal from the District Court's order dismissing his claims against the Borough of Carlisle.

Municipalities cannot be held liable under § 1983 based solely upon a theory of *respondeat superior*; rather, the plaintiff must identify a municipal policy or custom that caused his injury. *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000). "Policy" includes official proclamations made by a municipal decisionmaker with final authority, and "custom" is defined as "practices of state officials . . . so permanent and well settled as to virtually constitute law." *Berg*, 219 F.3d at 275 (internal quotation marks and citation omitted). To prove liability, the plaintiff must show that the municipal action was the "moving force" behind the constitutional violation. *Id.* at 276.

If the identified policy or custom "does not facially violate federal law, causation can be established only by 'demonstrat[ing] that the municipal action was taken with deliberate indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.'" *Id.* (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

Kelly alleges three alternative bases for municipal liability: (1) the Borough's policy that police consult with a prosecutor when unsure how to proceed; (2) the approval of Kelly's arrest by Police Chief Margeson; and (3) inadequate

30

training of police officers regarding the Wiretap Act and the First Amendment.[8]

A.

Kelly contends the Borough should be liable because Officer Rogers acted pursuant to Borough policy at all times. But Kelly does not proffer any evidence that the Borough's policies and practices were implemented with deliberate indifference. Instead, he asserts that a showing of deliberate indifference is required only for failure to train claims, and is not required for imposition of liability based on policy or custom. This assertion is incorrect.

For the proposition that deliberate indifference is not required, Kelly selectively relies on a statement by the Supreme Court that a municipality is liable for "all of its injurious conduct, whether committed in good faith or not." *Owen v. City of Independence*, 445 U.S. 622, 651 (1980). Kelly's reliance on *Owen* is misplaced because that case did not address implementation of a generally applicable policy; it concerned a city council's censure and termination of an employee without a hearing, and presented the question of whether municipalities

---

[8] Kelly also argues in passing that municipal liability rests on the Borough's delegation of decisionmaking authority to ADA Birbeck. We reject this argument summarily because Kelly has presented no evidence that the police department's practice of consulting with a prosecutor constituted a delegation of its final decisionmaking authority.

31

were entitled to good-faith qualified immunity from § 1983 liability. The Court rejected the proposed municipal qualified immunity and did not address when facially valid municipal policies constitute "injurious conduct." *Id*. at 657; *see Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007). Subsequent cases have established that, in order to be held liable for a facially valid policy, the municipality must have acted with deliberate indifference. In *Board of County Commissioners v. Brown*, the Court explained that "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." 520 U.S. at 404. Instead, the municipality is liable only if "municipal action was taken with the requisite degree of culpability." *Id.* Finally, the Court held that:

> [A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with '*deliberate indifference*' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.

*Id.* at 407 (emphasis added) (internal citations omitted). A showing of deliberate indifference is thus required in this case.

Kelly argues in the alternative that the Borough's policy does manifest deliberate indifference because it requires police officers to follow the ADA's advice as long as that advice is not "outlandish" or "outrageous" whereas the proper constitutional standard permits reliance on legal advice only if "reasonable."

32

Semantics are insufficient to satisfy Kelly's burden. Kelly has not presented any evidence that the Borough ignored obvious unconstitutional consequences in adopting the policy, nor has he shown that the Borough's implementation of the policy varied from constitutional standards. In fact, the adoption of such a policy tends to negate deliberate indifference because a policy of consulting with a lawyer in uncertain cases usually prevents unlawful arrests. *See Cox*, 391 F.3d at 34-35 (observing the "good sense" policy of "encourag[ing] officers to obtain an informed opinion before charging ahead and making an arrest in uncertain circumstances"). Thus, Kelly has fallen well short of meeting his burden of proving that the Borough's policy amounted to deliberate indifference to constitutional rights.

B.

An employee who lacks policymaking authority can still bind the municipality if a municipal policymaker delegated power to the employee or ratified his decision. *LaVerdure v. County of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003). But ratification occurs only "when a subordinate's decision is subject to review by the municipality's authorized policymakers [because] they have retained the authority to measure the official's conduct for conformance with their policies." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion). "Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy." *Id*. at 130.

Kelly claims the Borough is liable because Chief Margeson ratified Rogers's actions. This argument is without

33

merit as Kelly has presented no evidence that Chief Margeson was a final policymaker for the Borough. "The question of who is a 'policymaker' is a question of state law." *Andrews v. City of Phila.*, 895 F.2d 1469, 1481 (3d Cir. 1990). "In looking to state law, a court must determine which official has final, unreviewable discretion to make a decision or take an action." *Id.*; *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) ("In order to ascertain if an official has final policy-making authority, and can thus bind the municipality by his conduct, a court must determine (1) whether, as a matter of state law, the official is responsible for making policy *in the particular area* of municipal business in question, and (2) whether the official's authority to make policy in that area is *final and unreviewable*." (internal citations omitted)).

Kelly cites two cases in which we previously found that a police chief was a municipal policymaker. *See Keenan v. City of Phila.*, 983 F.2d 459, 468-69 (3d Cir. 1992) (relying upon analysis in *Andrews*, 895 F.2d 1469, to hold commissioner of police was policymaker for City of Philadelphia) and *Black v. Stephens*, 662 F.2d 181, 191 (3d Cir. 1981) (finding that police chief was policymaker for City of Allentown). In both cases, however, the determination that the chief of police was a policymaker was made only after examining the chief's responsibilities and decisionmaking authority with respect to the conduct at issue. *See Andrews*, 895 F.2d at 1481 (commissioner promulgated and disseminated police training manual and courses on sexual harassment, and established an Equal Employment Office to handle complaints of discrimination); *Black*, 662 F.2d at 191 (chief wrote and implemented official policy at issue, was a member of the Mayor's cabinet, and

34

established policies and procedures for entire police department). Kelly has not presented any similar evidence in this case; his perfunctory attempt to establish a record by citing a handful of Pennsylvania statutes concerning the authority of police chiefs in his reply brief is insufficient to meet his burden of proof in this regard.

Moreover, Kelly has presented no evidence that Officer Rogers's decision to arrest him was subject to final review by Chief Margeson. Chief Margeson testified at his deposition that he was informed of the arrest by a third officer a day or two after it occurred (after Kelly had been released from prison). While there was certainly evidence that Margeson agreed with Rogers's decision to arrest Kelly, in the absence of evidence that Chief Margeson "retained the authority to measure [Rogers's] conduct for conformance with [municipal] policies," Margeson's mere agreement is insufficient to show ratification. *Praprotnick*, 485 U.S. at 127.

C.

Finally, Kelly claims the Borough failed to adequately train Rogers regarding the elements of the Wiretap Act and the requirements of the First Amendment. He contends that constitutional violations were "extremely likely" to result from the Borough's failure.

Failure to adequately train municipal employees "can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." *Berg*, 219 F.3d at 276 (citation omitted). While it is theoretically possible to show

35

a deliberately indifferent failure to train in the absence of an underlying pattern of violations, "the burden on the plaintiff in such a case is high," because he must show that "a violation of federal rights [was] a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* (quoting *Board of County Commissioners*, 520 U.S. at 409).

Kelly concedes that he has not presented a pattern of violations. Kelly also fails to present any evidence that the situation is likely to recur or that false arrest was highly predictable. Instead, he argues that "the plethora of Pennsylvania cases reiterating that the statute does not apply unless the speaker has a [sic] expectation of non-interception (i.e. privacy)" shows that the likelihood of a recurring violation is high. This argument is unpersuasive. Although there are a number of cases addressing the Wiretap Act, these cases do not concern the improper enforcement of the Act by the police. *Cf. Johnson*, 388 F.3d at 686 (finding that, "[i]n light of the many Washington cases addressing enforcement of the Privacy Act by public officers performing official duties," there was a genuine issue as to whether a lack of training on the Privacy Act constituted deliberate indifference). Therefore, Kelly has failed to satisfy his burden on the failure to train claim.

## VI.

For the reasons stated herein, we will affirm the District Court's summary judgment in favor of the Borough of Carlisle. We will also affirm summary judgment in favor of Officer Rogers on Kelly's First Amendment claim. Finally, we will

36

vacate the District Court's summary judgment in favor of Officer Rogers on Kelly's Fourth Amendment claims and remand for further proceedings consistent with this opinion.