**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 20-1612

———————

THOMAS E. PRESTON,
Appellant

v.

FIDELITY BROKERAGE SERVICES

———————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:16-cv-01799)
District Judge:  Hon. Marilyn J. Horan

———————

Submitted on January 28, 2021

Before: RESTREPO, BIBAS, and PORTER, *Circuit Judges*

(Opinion filed: March 30, 2022)

———————

OPINION[1]

———————

RESTREPO, *Circuit Judge*.

---

[1] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Appellant Thomas E. Preston ("Preston") brought suit against his former employer Appellee Fidelity Brokerage Services LLC ("Fidelity") following his termination. Preston's complaint alleged claims, inter alia, of defamation in connection with his termination and statements Fidelity made on the termination notice filed with the Financial Industry Regulatory Authority (FINRA). Following motions for summary judgment by both parties, the District Court determined that there were no issues of material fact and granted Fidelity's motion. We affirm.

## I.    BACKGROUND

### a.  Factual Background

We write for the parties, and in so doing communicate only those facts necessary for the disposition of this matter. Fidelity is a broker-dealer registered under the Securities Exchange Act of 1934 and a member of FINRA.[2] Fidelity hired Preston as a Financial

---

[2] FINRA is an "association of brokers and dealers . . . registered as a national securities association pursuant to subsection (b)" of 15 U.S.C. § 78o-3 and "it is an independent, self-regulatory organization (SRO)." *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 92 (3d Cir. 2018) (internal quotations omitted). FINRA was established pursuant to Section 15A of the Securities Exchange Act, which "created a system of supervised self-regulation in the securities industry." *Id.* (internal quotations omitted) (citing *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1128 (9th Cir. 2005)). FINRA is authorized to "exercise comprehensive oversight over all securities firms that do business with the public." *Id.* (internal quotations omitted). FINRA's rules are "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . and, in general, to protect investors and the public interest." 15 U.S.C. § 78o-3(b)(6). As part of its responsibilities to provide oversight to its members, FINRA investigates and disciplines members and associated persons for violating laws and regulations. *See id.* § 78o-3(b)(7)-(8).

Consultant ("FC") in October 2011 and he worked in the investor center located in Pittsburgh, Pennsylvania. As an FC, Preston was subject to Fidelity's Temporary Lockout Policy ("TLO") set forth in Fidelity's "PI Investor Center, 2016 Rules of Engagement Rules of Relationship Policy Document." The TLO policy provides that an FC, under certain enumerated circumstances, may "lock out" a customer in Fidelity's database and receive exclusive financial renumeration for that customer. To properly exercise the TLO policy, an FC must have an "investment-related conversation [ ]" or "[v]alue-add conversation" with the customer or the prospect. App. 4-5. The policy also requires the FC to record and describe the conversation in the Seibel system, Fidelity's computer-based system kept as part of the company's books and records.

In February 2016, a Fidelity employee made an anonymous complaint with the company accusing unnamed FCs in Pittsburgh of "abusing the TLO system by locking out customers without actually [having] the requisite customer interaction." App. 732. This prompted Fidelity's Director of Employee Relations and its in-house counsel to launch an investigation into the claim, which was led by two Fidelity internal investigators, Matthew Pliskin and Eric Bronner. During the investigation, Pliskin and Bronner flagged seven of Preston's TLOs as concerning because the "length of the customer telephone calls appeared to be too brief" to properly qualify as a requisite value-added conversation. App. 7; App. 997. One TLO in particular involved a documented conversation with "Customer A." Preston placed three calls to Customer A: two recorded voice messages and one six-second call. In documenting his interaction

3

with Customer A in the Siebel note, Preston stated the following: "Called to introduce myself to him as [a] local point of contact for him. Sending my contact information. Will use if needed. Confirmed that TOA [transfer of assets] is in progress towards completion, saw note that fee adjustment was made."[3] App. 8.

Appellees argue that this call and Preston's subsequent Siebel note raised two concerns: (1) it was not plausible that Preston covered all of the topics documented in his Siebel note in six seconds, and (2) even if Preston's call with Customer A did occur as he documented it, the call would not qualify as a value-added conversation that could support a TLO. Appellee Br. at 5. When Fidelity's investigators interviewed Preston about his interactions with Customer A, Preston explained that the Siebel note reflected a conversation that occurred when Customer A returned his call. However, both parties agree that this alleged phone call is not reflected in Fidelity's phone logs. Immediately following their interview with Preston, Pliskin and Bronner briefed Preston's supervisor and representatives from Fidelity's legal, employee relations, and compliance teams. During the briefing, Pliskin and Bronner reported that Preston admitted that he did not have a conversation with Customer A and falsified his books and records. Preston denies making any such admission. Following the investigation, Fidelity concluded that Preston

---

[3] Preston subsequently received credits when Customer A eventually transferred his assets, which resulted in Preston receiving a bonus. Appellees say he would not have been entitled to otherwise receive said bonus. Appellee Br. at 5.

"falsified books and records to manipulate the compensation plan" and terminated Preston on April 14, 2016. Appellee Br. at 7.

On May 11, 2016, pursuant to its obligations, Fidelity submitted a Uniform Termination Notice for Securities Industry Registrations ("Form U5") to FINRA explaining the reasons for Preston's termination. [4] In response to the question "is this a full termination?", Fidelity selected "Yes" and explained that it "determined employee violated department procedures by recording a detailed customer interaction for purposes of performance credit without actually having had the requisite degree of interaction with the customer." App. 738; App. 1000. Preston alleges that these statements on the Form U5 are defamatory.

b. Procedural Background

Preston initiated this litigation on December 2, 2016, when he filed a complaint alleging age discrimination and defamation for statements Fidelity made on the Form U5 relating to his termination. Fidelity denied all material allegations. Following discovery and the District Court's ruling to exclude Preston's expert, both parties filed motions for summary judgment. The District Court granted Fidelity's motion, a decision which Preston now appeals with regard to the denial of his defamation claim only.

---

[4] When a registered representative is terminated, FINRA requires member firms, including Fidelity, to complete and file a Form U5 within thirty days of the termination. *See* FINRA Regulatory Notice 10-39, available at https://www.finra.org/rules-guidance/notices/10-39 (last visited February 12, 2022).

## II. JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* the District Court's grant of summary judgment. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016).

## III. STANDARD OF REVIEW

"Viewing the evidence in the light most favorable to the nonmovant, summary judgment is appropriate only if there is 'no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law.'" *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010) (quoting *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009)); Fed. R. Civ. P. 56(a). A "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## IV. DISCUSSION

Preston argues that the District Court erred in granting Fidelity's motion for summary judgment as to his defamation claim. The Pennsylvania Constitution provides the right to reputation is "a fundamental interest which cannot be abridged without compliance with constitutional standards of due process[.]" *R. v. Commonwealth, Dep't of Pub. Welfare*, 636 A.2d 142, 149 (Pa. 1994) (citation omitted). Pennsylvania law sets forth the seven following elements for a viable claim of defamation:

> (1) [t]he defamatory character of the communication; (2) [i]t's publication by the defendant; (3) [i]ts application to the plaintiff; (4) [t]he understanding by the recipient of its defamatory meaning; (5) [t]he understanding by the recipient of its defamatory meaning; (5) [t]he understanding by the recipient of it as intended to be applied to the plaintiff; (6) [s]pecial harm resulting to the plaintiff from its publication; [and] (7) [a]buse of a conditionally privileged occasion.

42 Pa. Cons. Stat. § 8343(a). As an initial matter, the parties dispute whether absolute or conditional privilege applies to Fidelity's statements on the FINRA Form U5 which Preston claims are defamatory. Preston asserts that conditional, rather than absolute, privilege is appropriate here, and a plaintiff can defeat conditional privilege through showing of malice or negligence.

a. Privilege

Under Pennsylvania law, "[l]iability for publication of defamatory matter may be defeated by a privilege to publish the defamation. One who publishes defamatory matter within the scope of an absolute privilege is immune from liability regardless of occasion or motive." *Agriss v. Roadway Exp., Inc.*, 334 Pa. Super. 295, 309 (1984) (quoting *Sciandra v. Lynett*, 409 Pa. 595, 187 A.2d 586 (1963)). Where a defendant raises privilege as a defense, he has the burden of proving that privilege exists. 42 Pa. Cons. Stat. § 8343(b)(2); *see also U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990). Conditional privilege arises in a defamation action when: "(1) some interest of the person who publishes defamatory matter is involved; (2) some interest of the person to whom the matter is published or some other third person is

7

involved; or (3) a recognized interest of the public is involved." *Miketic v. Baron*, 675

A.2d 324, 329 (Pa. Super. Ct. 1996) (internal quotation marks omitted); *Vargo v. Hunt*,

581 A.2d 625, 627 (Pa. Super. Ct. 1990). Preston further argues that Fidelity is not

entitled to absolute privilege as a matter of Pennsylvania law because Pennsylvania is not

among the four states in the United States that have determined that absolute privilege

applies to defamation claims relating to statements made on a Form U5.[5]

On the other hand, Fidelity argues that, as a matter of law, absolute privilege

applies due to the integral nature of the Form U5 in FINRA's regulatory responsibilities.

However, Fidelity claims that if conditional privilege does apply, then the proper

standard requires a showing of malice rather than mere negligence. Appellee Br. at 46

(citing *Bentlejewski v. Werner Enters., Inc.*, No. 13-1385, 2015 WL 4111476, at *7

(W.D. Pa. July 8, 2015)). It asserts that, regardless of which privilege applies, Preston

cannot defeat it because he fails to establish that Fidelity acted with either malice or

negligence.

    b.  Analysis

---

[5] Only four states in the United States have provided absolute privilege to form U5
defamation: California, Colorado, Massachusetts, and New York. Preston also argues that
Pennsylvania law does not afford Fidelity absolute privilege for three reasons: (1)
Pennsylvania provides greater protection to its defamed citizens than many other states in
the country because the State's Constitution protects reputation as a fundamental right of
mankind; (2) Pennsylvania does not follow the single-publication rule in cases of
database defamation; and (3) Pennsylvania recognizes the theory of defamation by
implication.

To date, this Court has not directly addressed the question of whether conditional or absolute privilege applies to statements made on a Form U5. However, we need not address this question here. The District Court applied the most plaintiff-friendly standard in evaluating the parties' summary judgment arguments: conditional privilege that can be defeated through only a showing of negligence. The District Court concluded that Fidelity was not negligent in completing the Form U5 and that Preston failed to establish genuine issues of material fact.

To reach this conclusion, the District Court determined that the record, viewed in its entirety and in the light most favorable to Preston, demonstrated no negligence on the part of Fidelity. The Court found that from the time that Fidelity received the anonymous complaint to the time it filed the Form U5, it "adhered to a course of action that was reasonable and methodical." App. 24. Three individuals, including Fidelity's in-house counsel, reviewed the initial anonymous complaint, which prompted a thorough investigation. The investigation commenced with a review of all of Fidelity's FCs in Pittsburgh, and multiple questionable TLOs led Preston to become the investigation's focus. After investigators interviewed Preston and reported their findings to his manager and Fidelity's in-house counsel, Fidelity determined that Preston falsely reported conversations to exercise the TLO policy and receive monetary compensation, a determination which the District Court noted was "sound and reasonable." App. 25. Fidelity then terminated Preston.

Preston made a six-second call to Customer A and noted it in the Siebel when he applied the TLO, though he admits that said call did not relate to the TLO. Instead, he claims that the information in the Siebel referred to an incoming call from Customer A, a call which both parties concede is not reflected in the relevant call logs. In fact, there is no evidence that this incoming call ever occurred. Preston further argues that the TLO was appropriate, though he provides no evidence to support this. As the District Court noted, the undisputed evidence shows that Mr. Preston "violated department procedures by recording a detailed customer interaction for purposes of performance credit without actually having had the requisite degree of interaction with the customer," exactly as Fidelity stated on the Form U5. App. 738; App. 1000.

Indeed, Fidelity's course of action demonstrates no indication of negligence. Fidelity received a complaint, investigated it, determined wrongdoing by Preston, terminated Preston, and prepared and submitted the Form U5 with accurate statements, as required. We agree with the District Court that these actions reflect that "Fidelity's course of conduct . . . [was] undertaken with care." App. 25. The District Court evaluated the evidence under the lowest standard of privilege analysis and, in doing so, determined that Preston did not present any evidence to support a finding of Fidelity's negligence in preparing and submitting the Form U5.

## V.    Conclusion

Viewing the facts in the light most favorable to Preston and drawing all reasonable inferences in his favor, the District Court determined that there were no genuine issues of

10

material fact. We agree. We adopt the District Court's reasoning and affirm its determination in favor of Fidelity on its Motion for Summary Judgment and against Preston on his Partial Motion for Summary Judgment.