RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0160p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JANICE BROWN,

　　　　　　　　　　*Plaintiff-Appellee*,

　　*v.*

ANDREW KNAPP; KEN SHINGLETON; BRYCE WILLOUGHBY; THOMAS DHOOGHE,

　　　　　　　　　　*Defendants-Appellants*.

No. 22-1973

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:20-cv-12441—Shalina D. Kumar, District Judge.

Argued: June 13, 2023

Decided and Filed: July 28, 2023

Before: KETHLEDGE, STRANCH, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Adam R. de Bear, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Austin Porter, Jr., PORTER LAW FIRM, Little Rock, Arkansas, for Appellee. **ON BRIEF:** Adam R. de Bear, John G. Fedynsky, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Austin Porter, Jr., PORTER LAW FIRM, Little Rock, Arkansas, for Appellee.

─────────────────

## OPINION

─────────────────

JANE B. STRANCH, Circuit Judge. In September 2018, Michigan State Police officers arrested Janice Brown without a warrant for alleged witness intimidation. She was jailed for

approximately 96 hours and was not brought before a judge for a probable cause hearing during that time. None of the officers involved in her arrest requested a warrant or took any other action relating to her detention. Brown sued the officers for unreasonably seizing her without probable cause and detaining her without due process of law, in violation of the Fourth Amendment. The officers moved for summary judgment based on qualified immunity. The district court denied their motion, and they appealed. We **AFFIRM** in part and **REVERSE** in part.

## I. BACKGROUND

### A. Factual Background

In 2017, Michigan State Police (MSP) detectives Kenneth Shingleton and Thomas Dhooghe were assigned to investigate a cold case, the 2011 killing of LeAnn Bates. The two learned that, the night of her murder, Bates was in her home with a woman named Sheneen Jones, along with both of their boyfriends. At the time, Bates was dating Jones's cousin, who was best friends with Jones's boyfriend, Dale Reed Jr. Jones told the detectives that she and Bates had argued, then Bates grabbed a gun. Jones ran out of the house to get away and heard gunshots behind her. She did not see who had fired, but Reed rushed outside and told her to get in the car. Jones said that, in the following days, she received a threat that she would be killed by Reed's family. Jones's cousin identified Reed as Bates's shooter, and in July 2018, Reed was arrested and charged with homicide and related weapons charges. Reed and Jones have a daughter together.

Plaintiff Janice Brown is Reed's mother. In September 2018, she traveled from her home in Arkansas to Michigan to attend a court hearing in Reed's pending homicide case, which was scheduled for September 11, 2018. Brown and the two MSP detectives who had been assigned to the case, Shingleton and Dhooghe, all attended the hearing. Jones had been named as a witness in the state's case against Reed and received a subpoena but did not appear to testify, and her cousin also recanted his identification of Reed as the shooter. The court continued the hearing until September 14, 2018. After the hearing ended, Dhooghe overheard Reed's defense attorney tell Brown that "someone needs to talk to her." Dhooghe and Shingleton interpreted the statement as the attorney directing Brown to speak with Jones; Brown says that the attorney was

explaining that someone needed to tell Jones she needed to retain an attorney after failing to appear at the hearing.

Later that same day, Shingleton and Dhooghe visited Jones's home to serve a subpoena on her for the September 14 hearing. When they arrived, Brown was there. The MSP detectives asked Brown why she was at Jones's house, and Brown said she was visiting her granddaughter. Brown left, and the detectives asked Jones whether Brown was bothering her or had offered her money not to testify. Jones denied both but said she did not want to testify, and she continued to express fear that "they" would kill her if she did, although she did not identify who "they" were. Brown remained in Michigan for the next few days, spending more time with Jones and her granddaughter.

On September 14, Brown, Jones, and Jones's daughter arrived at the courthouse. Brown took her granddaughter into the courtroom while Jones went into the prosecutor's office, where she said she would not provide testimony implicating Reed. As Jones left the prosecutor's office and Brown exited the courtroom, Brown followed behind Jones. The assistant prosecutor assigned to Reed's case, Karen Hanson, testified that, at this time, she saw Brown following closely behind Jones as Jones cried. According to Hanson, Brown was yelling at Jones that she "couldn't go testify and she better not go in there." Hanson claims it was the most aggressive attempt to get someone not to testify that she had ever seen. Hanson yelled that Brown was bothering Jones, and Brown went back into the courtroom.

Hanson called over the officer in charge, described what she had seen, and said that there was probable cause to arrest Brown. She does not remember whether she instructed an officer to arrest Brown, but Dhooghe testified that she told him to do so. The district court found it unclear whether Dhooghe and Shingleton were both involved at this point, or only Dhooghe. Brown says Hanson discussed the alleged intimidation with Dhooghe and Shingleton; the MSP Defendants say Hanson spoke with Dhooghe only; and Hanson testified that she did not remember who she spoke to.

The parties similarly disagree as to which detective was present in the courtroom that day: Brown claims that Shingleton approached her, whereas the MSP Defendants claim Dhooghe

was present and Shingleton was not. Brown remembered Shingleton from her earlier interaction with him at Jones's house on September 11 because he had been "hostile" towards her, and she believed him to be the person who approached her in the courtroom on September 14. Brown noted that Shingleton had authored a supplemental incident report about her arrest, dated September 19, 2018, "as if he was there" when she was arrested. Brown also testified that, on September 14, she saw only one of the two detectives who she had met on September 11, and that she would not be able to tell Shingleton and Dhooghe apart if they were sitting next to each other. For his part, Dhooghe testified that he was the detective present at Brown's arrest, which MSP officers Bryce Willoughby and Andrew Knapp confirmed, and Shingleton similarly testified he was not present in court on September 14.

The district court did not resolve this question. It found that one or both of the two MSP detectives confronted Brown in the courtroom and told her they thought she had not been visiting her granddaughter the day they saw her at Jones's home because the granddaughter had been at school. Dhooghe (who was scheduled to testify that morning) was in civilian clothes and lacked handcuffs, so he called his supervisor, Detective Willoughby, for help. Approximately five minutes later, Willoughby and Knapp entered the courtroom and arrested Brown for witness intimidation.

Willoughby and Knapp transported Brown to the Flint Police Department and filled out booking paperwork. Brown was booked into the Flint City jail, then transferred to the Genesee County jail. At the time, the State of Michigan had an agreement to house people arrested by MSP at that jail because MSP does not itself maintain any jail or other institution to incarcerate people pre-trial. After her arrest, Dhooghe (and potentially Shingleton) returned to Jones's home and asked if Brown had been intimidating her, but Jones did not wish to speak to them.

Brown was in jail for approximately 96 hours; during that time, she was not brought before a judge for a probable cause hearing, and the MSP Defendants never requested a warrant for her arrest or took any other action relating to her detention. Hanson testified that her prosecutor's office typically waits for the arresting officers to submit a prosecutor's packet, and without that packet, the prosecutor will not prepare a warrant or proposed complaint needed for the probable cause hearing. While Brown was incarcerated, the Genesee County jail sent reports

to MSP employees indicating that Brown had remained in custody without a warrant or probable cause hearing for over 48 hours.  Brown claims that Shingleton received those reports; the MSP Defendants claim they went only to commanding officers, not the arresting officers.  Shingleton was not personally listed as an addressee of the report that was emailed on September 15, 2018, though other MSP recipients were.  Brown was released on September 18, 2018, "pending further investigation" under Shingleton's orders.

As relevant to this appeal, Brown sued the MSP detectives and troopers (collectively, the MSP Defendants) for violating her Fourth Amendment rights by unreasonably seizing her without probable cause and detaining her without due process of law.[1]  The MSP Defendants moved for summary judgment on the basis of qualified immunity; Brown moved for partial summary judgment on the issue of whether her Fourth Amendment rights were violated by being held for over 48 hours without a probable cause hearing.  The district court denied both motions, finding that the MSP Defendants were not entitled to qualified immunity because they had collectively violated Brown's clearly established right to a prompt probable cause determination within 48 hours of her arrest.  But because of the "complicated factual scenario" surrounding Brown's arrest, the court could not determine at the summary judgment stage which MSP Defendant or Defendants bore legal responsibility for violating her rights.  The MSP Defendants appealed.

## II. JURISDICTION

A district court's denial of qualified immunity is immediately appealable under the collateral order doctrine.  *See Rafferty v. Trumbull County*, 915 F.3d 1087, 1092 (6th Cir. 2019).  But circuit courts can generally review a denial of qualified immunity "only 'to the extent that it turns on an issue of law'—the appeal cannot be from a district court's determination that there is a genuine dispute of material fact."  *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).  Put another way, "a determination that

---

[1]Brown also named Jason Gould, the jail administrator, Mackenzie Rose, a jailer at Genesee County Jail, and Genesee County, Michigan, in her complaint (collectively, the Genesee County Defendants), and alleged a malicious prosecution claim against Shingleton and Dhooghe.  The district court granted the Genesee County Defendants' motion for summary judgment and dismissed Brown's malicious prosecution claim.  Brown does not appeal either ruling.

a given set of facts violates clearly established law is reviewable, while a determination that an issue of fact is 'genuine' is unreviewable." *See v. City of Elyria*, 502 F.3d 484, 490 (6th Cir. 2007) (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)).

We can "ignore the defendant's attempts to dispute the facts," *Est. of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005), as long as the issues on appeal are purely legal and the defendant is "willing to concede the most favorable view of the facts to the plaintiff," *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018) (quoting *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)). "The upshot is that, in most appeals of denials of qualified immunity, we must defer to the district court's determinations of fact" and any inferences drawn therefrom. *Barry*, 895 F.3d at 443. We are not, however, categorically "limited to only the facts, evidence, or inferences that the district court has stated expressly"; if the district court denies a summary judgment motion without indicating its rationale for doing so, we may undertake a "review of the record" to determine the facts assumed. *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015); *Johnson*, 515 U.S. at 319. We may review a district court's factual determination only if it is "blatantly and demonstrably false," *Barry*, 895 F.3d at 443 (quoting *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012)), for example, if a videotape of the events at issue so contradicts the nonmoving party's version of the record that "no reasonable jury could believe" the nonmovant, *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The MSP Defendants explicitly concede the facts in the light most favorable to Brown and claim to raise only purely legal issues. They argue that: (1) they did not violate Brown's right to be free from an arrest without probable cause; (2) they did not violate Brown's right to a prompt probable cause determination; and (3) there was no clearly established law governing their conduct with respect to Brown's detention. Broadly speaking, these appear to be legal questions properly raised on appeal.

One last note before proceeding to the appeal's merits. The MSP Defendants would have us disregard the district court's conclusion as to one factual issue and resolve it instead, namely, that it was disputed whether Shingleton was present at the hearing or arrest on September 14, 2018. The MSP Defendants argue, as they did below, that Shingleton did not witness Brown allegedly intimidating Jones, was not physically present at the time of her arrest, and became

aware of her arrest only on September 18, 2018, when the jail contacted him and he ordered Brown's release.  The MSP Defendants describe Brown's position that Shingleton was present for and involved in her arrest as supported only by "groundless belief."

To be sure, the record on this question is mixed at best.  Brown says Shingleton was there on September 14, Shingleton and the other MSP Defendants say he was not, and Hanson does not remember whether she spoke with him that day.  It is unsurprising that the parties' recollections differ.  But such differences do not render the record so one-sided as to make the district court's conclusion "demonstrably false," as is required for review on appeal.  *Barry*, 895 F.3d at 440.  There is no videotape or other evidence "blatantly" contradicting either party's version of events.  *See Scott*, 550 U.S. at 378-81; *Austin*, 690 F.3d at 496-97 (where videotapes were inconclusive as to events, district court properly concluded that factual dispute existed).  At bottom, the MSP Defendants' argument is about the sufficiency of the evidence: they "challenge directly the plaintiff's allegations (and the district court's acceptance) of 'what actually occurred . . . ,' who did it, or 'nothing more than whether the evidence could support a jury's finding that particular conduct occurred,'" *DiLuzio*, 796 F.3d at 609 (brackets omitted) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011); then quoting *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)).  It is not within our jurisdiction to resolve this dispute.  We proceed with deference to the district court's determination of facts.

## III.  ANALYSIS

We review a district court's denial of qualified immunity de novo, *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022), and a district court's refusal to address the merits of a defendant's motion asserting qualified immunity is equivalent to a denial for purposes of appellate review, *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004).  "When, as here, a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to immunity."  *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).  And when more than one officer is involved, "the court must consider each officer's entitlement to qualified immunity separately."  *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam).  We address each of Brown's claims below.

## A. Brown's Arrest

The district court did not address the MSP Defendants' qualified immunity arguments as to Brown's claim that they violated her Fourth Amendment right to be free from arrest without probable cause. It noted only that Brown "contest[ed]" the existence of probable cause to arrest her. Nevertheless, the district court denied the MSP Defendants' motion for summary judgment in its entirety, implicitly addressing the issue of whether the MSP Defendants were entitled to qualified immunity on Brown's probable cause claim and making it reviewable on appeal. *See Freed v. Thomas*, 976 F.3d 729, 741 (6th Cir. 2020).

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The existence of probable cause depends upon "the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* When there is "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing" that an offense had been or was being committed, there is generally probable cause. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000)) (alteration in *Gardenhire*). An officer must "consider the totality of the circumstances," and "cannot look only at the evidence of guilt while ignoring all exculpatory evidence when assessing probable cause." *Id.* (quoting *Gardenhire*, 205 F.3d at 318). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Gardenhire*, 205 F.3d at 315.

It is clearly established that "[a]n eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation marks and citation omitted). A person does have a right to be free from arrest "based solely on an eyewitness account that is in some way untruthful or unreliable." *Ouza*, 969 F.3d at 282. "At most," an "unreliable and uncorroborated" eyewitness account alone "gives an officer reasonable suspicion of criminal activity such that the

officer would be justified in investigating further pursuant to *Terry v. Ohio*." *Id.* But where such an account is corroborated by other evidence, the officer may properly conclude that there is probable cause for a warrantless arrest. *Cf. id.*

Brown was arrested for violating Michigan law, which provides in relevant part that a person shall not, by threat or intimidation, "[d]iscourage or attempt to discourage any individual from attending a present or future official proceeding as a witness, testifying at a present or future official proceeding, or giving information at a present or future official proceeding."[2] Mich. Comp. Laws § 750.122(3)(a). The following facts are undisputed: Jones had told Dhooghe and Shingleton that she received threats from Reed's family; at the September 11 hearing, Dhooghe overheard Reed's lawyer telling Brown that "someone needs to talk to her"; Dhooghe and Shingleton saw Brown at Jones's home just after they saw her at the September 11 hearing; and Hanson told the officer in charge on September 14 that she had witnessed Brown intimidating Jones and telling her not to testify, and that there was probable cause to arrest Brown. Brown's retort is that Dhooghe and Shingleton blamed her for the case against Reed "falling apart," that they wanted to "punish her" for interfering, and that Hanson was lying. Brown offers no evidence to support her claim. Given the events and behavior Dhooghe and/or Shingleton knew about, there was no reason for them to believe that Hanson was lying or mistaken when she told the officer in charge what she had seen and said that there was probable cause for Brown's arrest. Under the totality of the circumstances, the officers therefore had probable cause to arrest Brown for witness intimidation.

Alternatively, the MSP Defendants argue that an officer should generally be entitled to rely on a prosecutor's independent judgment that probable cause exists. In their view, Hanson's conclusion that probable cause existed to arrest Brown was enough on its own. In support, they cite *Steiger v. Hahn*, 718 F. App'x 386, 391 (6th Cir. 2018), and *Kelly v. Borough of Carlisle*, 622 F.3d 248, 255-56 (3d Cir. 2010). Both these cases are readily distinguishable. In *Steiger*, detectives gathered extensive evidence, conferred repeatedly with the Michigan Attorney

---

[2]Brown also cites another potentially relevant subsection: "A person shall not willfully impede, interfere with, prevent, or obstruct or attempt to willfully impede, interfere with, prevent, or obstruct the ability of a witness to attend, testify, or provide information in or for a present or future official proceeding." Mich. Comp. Laws § 750.122(6).

General's office to review the evidence, then applied for an arrest warrant for Steiger based on the conclusion of the Attorney General that the evidence was sufficient to establish probable cause. 718 F. App'x at 387-89. We held that, given the thorough and deliberate process of the investigation into Steiger's behavior, which allowed sufficient time for the Attorney General to review the pertinent evidence, the detectives could rely on the Attorney General's judgment that probable cause existed to charge Steiger and were entitled to qualified immunity as to Steiger's false arrest claim. *Id.* at 391-92. The circumstances here were quite different; there was no deliberative, collaborative process between the MSP Defendants and the prosecutor's office to review the evidence of Brown's alleged crime, only a conversation between Hanson and the officer in charge.

In *Kelly*, the Third Circuit held that "a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause." 622 F.3d at 255-56. But the "reliance must be itself objectively reasonable" and "a plaintiff may rebut this presumption by showing that, under all of the . . . circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice." *Id.* at 256. The *Kelly* court reversed a district court's finding that it was objectively reasonable for an officer to rely on a prosecutor's advice regarding probable cause where the officer had observed conduct that he thought constituted a crime, then called the prosecutor to verify that the conduct was a crime sufficient to justify probable cause for arrest. *Id.* at 251, 255-59. The court held that additional fact-finding was necessary to assess whether the officer's reliance on the prosecutor's advice was reasonable. *Id.* at 258-59.

*Kelly*, of course, is not binding. *See Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 278 (6th Cir. 2010). Moreover, the *Kelly* court determined that the reasonableness of relying on a prosecutor's advice depends on the circumstances. *Kelly*, 622 F.3d at 258-59. Here too, there may be factual questions about the reasonableness of relying upon Hanson's assessment of probable cause, e.g., whether the officers present could have reasonably questioned her ability to neutrally assess that there was probable cause to arrest Brown. We decline to endorse the MSP Defendants' position as to the dispositive nature of Hanson's legal conclusion. Regardless,

under the totality of the circumstances, there was probable cause to arrest Brown.  *See Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004) (situating pre-arrest consultation with a prosecutor in the "totality of the circumstances" and collecting cases from other circuits).  The MSP Defendants did not violate her Fourth Amendment right to be free from arrest without probable cause and are entitled to qualified immunity on Brown's false arrest claim.

## B.  Brown's Detention

"Individuals arrested and detained without a warrant are entitled to a 'prompt' judicial determination of probable cause."  *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975)).  In the absence of exceptional circumstances, the government must generally provide a probable cause determination within 48 hours for the determination to be considered sufficiently prompt.  *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991).  A failure to do so violates the individual's Fourth Amendment rights and is known as a *Riverside* violation.[3]  *See id.*  Where the arrested person does not receive a probable cause determination within 48 hours, the government bears the burden of demonstrating "the existence of a bona fide emergency or other extraordinary circumstance" that would justify the delay.  *Id.* at 57.

There is no dispute that Brown was detained without a probable cause hearing for approximately 96 hours, and that she was entitled to such a hearing absent extraordinary circumstances.  But although the MSP Defendants cursorily assert that the circumstances here were extraordinary, they fail to support that assertion or develop that argument.  Instead, the MSP Defendants argue that (1) they "personally" did not intentionally violate Brown's right to receive a prompt determination of probable cause; and (2) it was not clearly established at the time that the MSP Defendants' conduct was a violation of Brown's rights given the circumstances.

---

[3]Brown also asserted that her detainment without a hearing violated the Fifth Amendment's Due Process Clause as incorporated through the Fourteenth Amendment.  "[I]t is the Fourth, rather than the Fourteenth, Amendment that applies to this case because 'the Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary . . . determination of probable cause,'" whereas "due process regulates the period of confinement after the initial determination of probable cause."  *Drogosch*, 557 F.3d at 378 (quoting *Vollanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992)).

1. <u>The MSP Defendants' Violation of Brown's Rights</u>

We "look to state law to determine who is responsible for ensuring that a judicial determination of probable cause takes place within 48 hours" of an arrest. *Drogosch*, 557 F.3d at 378-79 (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 644 (6th Cir. 2003)). Michigan state law provides that it is the duty of "[a] peace officer who has arrested a person for an offense without a warrant" to take the person arrested before a magistrate "without unnecessary delay." Mich. Comp. Laws § 764.13. Thus, the officer or officers who arrested Brown had the legal obligation to ensure she received a probable cause hearing within 48 hours. In Michigan, an arrest is "the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." *People v. Gonzales*, 97 N.W.2d 16, 19 (Mich. 1959) (quoting 4 Am. Jur. Arrest, § 2); *see also Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002).

Under Michigan law, Willoughby and Knapp were arresting officers with a *Riverside* obligation because they arrested Brown by handcuffing her, physically taking her into custody, and transporting her to jail. The MSP Defendants acknowledge as much.[4] *See* Appellants' Br. at 31. The parties disagree vociferously, however, as to Shingleton and Dhooghe's obligations. Taking the facts as found by the district court and in the light most favorable to Brown, Dhooghe was physically present at the courthouse, potentially spoke with Hanson, and directed Knapp and Willoughby to arrest Brown. Although Dhooghe did not physically arrest Brown because he did not have his handcuffs on him, he still took actions that "indicate[d] an intention" to take Brown into custody and subjected Brown to his will by directing other officers to take her into custody. *Gonzales*, 97 N.W.2d at 19. Dhooghe was an arresting officer for purposes of the *Riverside* analysis. As for Shingleton, the district court found it was unsettled whether he was physically present when Brown was arrested. Assuming, in the light most favorable to Brown, that he was,

---

[4]The MSP Defendants suggest that Willoughby and Knapp are not responsible because § 1983 actions are limited to deprivations of federal statutory and constitutional rights and do not encompass violations of state law. This is shadowboxing: Brown does not claim that Knapp and Willoughby violated state law. Rather, she alleges that they violated her Fourth Amendment rights. As the MSP Defendants' own brief notes, we look to state law merely to define those rights.

Shingleton was one of the detectives in charge of the Reed case that Hanson contacted to report Brown's intimidation and discuss her arrest. Additionally, he authored a report about Brown's arrest and was aware of her incarceration such that he eventually authorized her release. Shingleton was thus part of the decision to arrest Brown and direct Knapp and Willoughby to physically take her into custody. By so doing, he took actions indicating intent to take Brown into custody and was therefore also an arresting officer.

The MSP Defendants contend that they "lacked the power to convene a probable cause hearing on their own," and that it was objectively reasonable for them to assume that Hanson would secure Brown's arrest warrant. Although Michigan law requires the arresting officer to bring a person arrested without a warrant before a magistrate for their probable cause hearing, other parties must act as well: the prosecutor requests the warrant and a magistrate makes a finding of reasonable cause and ultimately issues the warrant. *See* Mich. Comp. Laws § 764.1a(1), (2)(d), (4). The MSP Defendants claim that not one of them observed the factual allegations supporting Brown's arrest or had the personal knowledge needed to author an affidavit. In their view, only Hanson could have sworn out a complaint and requested a warrant, and they cannot be held liable for any failure to do so.

This position ignores the undisputed fact that the MSP Defendants did not even attempt to ensure that Brown received a probable cause hearing. Hanson herself testified that the prosecutor's office typically waits for the arresting officers to submit a prosecutor's packet before preparing a warrant or proposed complaint. Nothing in the record indicates that the MSP Defendants could not have followed this routine procedure by preparing a prosecutor's packet and contacting Hanson to collect an affidavit from her. This is particularly true if Hanson could not investigate and prosecute the case, given that she was a witness to the alleged crime. The MSP Defendants "essentially contend[] that 'someone screwed up, but it wasn't me.'" *Drogosch*, 557 F.3d at 378. Under Michigan law, however, they were responsible for bringing Brown before a magistrate for a prompt probable cause determination. *See id.* at 379. The MSP Defendants cannot skirt this duty by pointing fingers elsewhere. In sum, all four MSP Defendants had a *Riverside* obligation.

The MSP Defendants maintain that they did not intentionally violate that obligation, citing the general requirement for § 1983 liability that a defendant must have acted "knowingly or intentionally to violate [a plaintiff's] constitutional rights such that mere negligence or recklessness is insufficient."[5] *Ahlers*, 188 F.3d at 373. In the context of a *Riverside* claim, we have held that, where the "undisputed record" establishes a violation of the *Riverside* 48-hour rule and the defendant fails to "identify any emergency or other extraordinary circumstance" as justification, the plaintiff "can withstand the first prong of the qualified immunity inquiry by virtue of the violation of her Fourth Amendment right to a judicial determination of probable cause within 48 hours of her arrest." *Cherrington*, 344 F.3d at 644. So, the question is whether the MSP Defendants can establish an emergency or extraordinary circumstance to merit Brown's prolonged detention.

The MSP Defendants' only answer is that "the alleged offense happened in the presence of an assistant prosecutor who directed one police officer to arrest Brown and who in turn referred that request to another officer who happened to be in uniform and with handcuffs." Appellants' Br. at 26. This proposed "extraordinary circumstance" does not take Brown's case "outside the usual 48-hour rule." *Cherrington*, 344 F.3d at 643. Regardless of the precise mechanics of Brown's arrest, the bottom line is that multiple officers were involved in her arrest and subsequent transport to custody. The MSP Defendants offer no reason that the involvement of multiple officers—an everyday occurrence in arrests across the country—would prevent or excuse them from complying with their *Riverside* obligations. The presence of a witness to the alleged crime during an arrest is similarly common and of no moment. The MSP Defendants therefore violated Brown's right to receive a prompt determination of probable cause.

---

[5]The cases the MSP Defendants cite to support their desired rule both analyzed conceptually distinct Fourth Amendment claims that used their own particularized standards. *See Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019) ("In the context of a Fourth Amendment claim that a police officer lied in a search warrant, we have distilled a specific inquiry."); *Caminata v. County of Wexford*, 664 F. App'x 496, 500 (6th Cir. 2016) (intentional or reckless action is a "necessary element of both" Fourth Amendment claims of "fabrication of evidence and malicious prosecution").

2.  Whether Brown's Rights Were Clearly Established

A constitutional right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citation omitted).  Existing law must put the "constitutionality of the officer's conduct 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Supreme Court has "stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).  That said, a "plaintiff need not always put forth 'a case directly on point'" to show that her rights "were indeed clearly established at the time of the conduct." *Shumate v. City of Adrian*, 44 F.4th 427, 449 (6th Cir. 2022) (quoting *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam)).  A"[p]laintiff need not show that 'the very action in question has previously been held unlawful, but . . . in light of pre-existing law, the unlawfulness [of the official action] must be apparent.'" *Id.* at 449-50 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (second alteration in *Shumate*).

The parties focus their attention on four relevant cases: *Cherrington v. Skeeter*, 344 F.3d 631 (6th Cir. 2003) (denied qualified immunity); *Drogosch v. Metcalf*, 557 F.3d 372 (6th Cir. 2009) (same); *Rayfield v. City of Grand Rapids*, 768 F. App'x 495 (6th Cir. 2019) (granted qualified immunity); and *Roberson v. Wynkoop*, No. 21-1240, 2021 WL 5190902 (6th Cir. 2021) (per curiam) (same).  We summarize each.

Cherrington was arrested in Ohio early on a Saturday morning in the late summer of 1996 and was not arraigned until the following Tuesday.  344 F.3d at 635.  She was arrested without a warrant and was not provided with a probable cause hearing for over 72 hours while detained. *Id.* at 642-43.  The defendant officers argued that their failure to present Cherrington for a probable cause determination should be excused because her arrest occurred over the Labor Day holiday weekend and because she was cooperating in an undercover investigation in the days following her arrest, which would have been jeopardized by a probable cause hearing.  *Id.* at 643. We held that the officers were not entitled to qualified immunity given *Riverside*, which put

officers on notice of defendants' Fourth Amendment right to a probable-cause hearing within 48 hours, and which "expressly caution[ed]" that intervening weekends and holidays did not qualify as "extraordinary circumstances" "permit[ting] relief" from that requirement. *Id.* at 643-44.

Next, in 2004, officers randomly searched Drogosch's Michigan home, recovering a firearm. 557 F.3d at 375. He was on probation at the time but was not disqualified from owning a firearm under the terms of his probation order. *Id.* Drogosch tried to explain the situation to the officers, but they arrested him anyway. *Id.* at 376. When Drogosch was brought to jail, the arresting officer completed a *parole* detainer form, not a probation detainer form, even though he was aware that detained parolees were not entitled to an immediate hearing, while detained probationers were. *Id.* Drogosch was then imprisoned for more than 48 hours (in fact, for over a week) without a probable cause hearing. *Id.* at 376-77. The arresting officer argued that he "had no legal obligation to physically bring Drogosch before a judge for a probation-violation hearing," and that he had done what was required of him by bringing Drogosch to jail, filling out the paperwork, and contacting Drogosch's probation officer. *Id.* Here, too, we held that the officer was not entitled to qualified immunity. *Id.* at 380. Under Michigan law, he failed to fulfill his duty to ensure Drogosch received a probable cause hearing—and even if he was not "technically" responsible for bringing Drogosch before a judge, it was his decision to use an inapplicable detainer form that was "the root cause" of the constitutional violation. *Id.* at 378-79. Furthermore, *Riverside* preceded Drogosch's arrest by over a decade and "would have alerted a reasonable official" to his Fourth Amendment right to a prompt probable hearing.[6] *Id.* at 379.

Then, in 2014, Rayfield was arrested in Michigan after a domestic dispute with his neighbor. 768 F. App'x at 499. At some point after his arrest, Rayfield was transferred from the City of Grand Rapids Police Department to the County of Kent pursuant to an agreement between the City and the County that the County would house people arrested by the Grand Rapids Police Department. *Id.* In total, Rayfield was detained for more than 48 hours without a

---

[6]We also discussed the objective reasonableness of the officer's actions, finding that his "act of imprisoning Drogosch involved nothing like split-second decisionmaking" and that he had "plenty of time to ponder the decision of whether to lodge Drogosch in the jail using the incorrect detainer form." *Id.* at 379-80. The officer "would have known that Drogosch was not in violation of his probation and was not even a felon if he had bothered to look at the probation paperwork that Drogosch tried to show him before the arrest." *Id.* at 380.

probable cause hearing; it is unclear how much time he spent in the City's custody as opposed to the County's. *Id.*; *see id.* at 508-09.  We found that it was "admittedly arguable that when [the Grand Rapids defendants] transferred custody of Rayfield to the County facility, they should have alerted the County officials regarding the length of time that they had previously detained Rayfield, to ensure that Rayfield was not detained for a *total* of more than 48 hours before a hearing." *Id.* at 508-09.  We nevertheless affirmed the district court's decision to grant the arresting officers' motions to dismiss on the grounds of qualified immunity. *Id.* at 508-10.  We reasoned that, even if the officers had violated Rayfield's constitutional rights by detaining him for more than 48 hours without a probable cause hearing, *Cherrington* had not addressed "the factually and legally distinct situation presented by Rayfield's case, namely when two municipalities, both of which have authority to process a detainee, jointly manage the custody of a pre-hearing detainee." *Id.* at 509-10.  Although we could "plausibly conceive of a situation in which City and County officials would violate a detainee's rights under *County of Riverside* by failing adequately to inform the other municipal authority regarding the status of the individual's detention," it was not clearly established that any failure by the officers to do so had violated Rayfield's constitutional rights. *Id.* at 510.

Finally, in 2016, Roberson was arrested at his Michigan residence by MSP troopers after a domestic dispute.  2021 WL 5190902, at *1.  The arresting officer completed the incident report and paperwork requesting an arrest warrant over 24 hours after Roberson was arrested; once the report and warrant packet were submitted, the situation was "out of [the officer's] hands." *Id.*  The prosecutor processed the paperwork quickly, but the judicial officer did not hold the probable cause determination until the next morning, more than 48 hours after Roberson was arrested. *Id.*  We found that the officer was entitled to qualified immunity because, even if he had violated Roberson's constitutional rights, "*Riverside* and its progeny [did] not clearly establish that an officer in [the trooper's] position [was] liable in particularized circumstances like these." *Id.* at *2.  MSP "troopers rely on other agencies and actors in the criminal justice system to ensure that arrestees receive their probable cause determination" because the MSP does not own or operate its own jails, and it was not objectively unreasonable for the arresting officer "to expect the process to occur in a timely manner as it normally does" given that he had completed the requisite paperwork. *Id.* at *3.

The MSP Defendants argue that *Rayfield* and *Roberson* (which both granted qualified immunity) demonstrate that their conduct was lawful, and that neither *Cherrington* nor *Drogosch* (which both denied qualified immunity) is sufficiently particularized to put them on notice that their actions were *un*lawful.  We disagree on both points.

*Rayfield* and *Roberson* are distinguishable, as well as non-binding.  In *Rayfield*, the issue was a lack of communication between two municipalities jointly managing a person's pretrial detention: Rayfield was in Grand Rapids custody for some time, then transferred to the County of Kent's custody without notification to the County officials of how much time he had spent in City custody.  *See* 768 F. App'x at 508-10.  Here, the problem is not the MSP Defendants' and Genesee County's communication (and, in fact, it seems that Genesee County *did* flag Brown's ongoing detention to MSP employees).  There is no evidence that the MSP Defendants took any steps at all to facilitate a timely probable cause hearing for Brown.[7]  *Roberson* is distinguishable for that same reason.  The arresting officer there completed the necessary paperwork to secure Roberson a probable cause hearing.  2021 WL 5190902, at *1.

*Cherrington* established in 2003 that officers are assumed to be aware of an individual's right to a probable cause determination within 48 hours.  *Cherrington*, 344 F.3d at 644.  And *Drogosch* confirmed almost a decade before Brown was arrested that, in Michigan, arresting officers have an obligation to try to secure a probable cause hearing for the person they arrest, including by filing appropriate paperwork.  *Drogosch*, 557 F.3d at 379-80; *see also Cherrington*, 244 F.3d at 644.  It was therefore clearly established at the time of Brown's arrest that her arresting officers had a duty to take her before a magistrate for a probable cause hearing.  The MSP Defendants made no efforts to do so, and they are not entitled to qualified immunity on Brown's *Riverside* claim.

---

[7]The MSP Defendants' reliance on *Rayfield* is troubling for another reason: the MSP does not own or operate its own jails, so it must coordinate with municipalities to house detainees on its behalf.  Under the MSP Defendants' theory, the agency could *always* be entitled to qualified immunity for *Riverside* claims because MSP arrests and pretrial detentions necessarily involve multiple municipalities and agencies.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment as to Brown's *Riverside* claim and **REVERSE** the district court's judgment as to Brown's false arrest claim. We **REMAND** the case for further proceedings consistent with this opinion.